number 14-1487, Mr. Donahue and Mr. Seath. Mr. Seath, am I pronouncing your name correctly? Your Honor, it's Shaw, pronounced like S-A-W-N. Got it. Thank you. Thank you, Your Honor. Good afternoon, Your Honor. Good afternoon, Your Honor. May I please the Court, Keith Donahue for Appellant Rodney Frierson. I may I'd like to reserve three minutes of my time for rebuttal. That's fine. Thank you, Your Honor. This is a case about a prolonged roadside detention without reason to suspect any criminal activity was afoot. It's clear from the record that the State Trooper who pulled over Mr. Frierson was going to prolong this stop for as long as it took to hunt for the reasonable suspicion that he lacked. That's his own communications, first to the dispatch center at about 10 minutes into the stop, when he says, I'm going to be a while. And then about 20 minutes into the stop. I watched the recording, and the first 10 minutes, 15 minutes or more, he's getting information. And the officer, the trooper, is getting information that's causing him some concern that the driver of the car is not on the rental agreement with Enterprise. That the driver of the car has had a manslaughter murder conviction. Has had a weapons violation. Has had a drug crime. That this person has spent a fair amount of time in prison in the last few years. So he's a tenant or going up. And then he later gets more information. But during the first 10 or 15 minutes, I don't know what else the trooper could have done. If he's getting this information and getting more and more and more, what's he supposed to say? I just disregard it? Well, your Honor, it's focused on the criminal history here. The point is, at the outset he was talking about, okay, you were going 76 in a 65 mile per hour zone. I may just give you a warning. But then he's going back and he's saying, whoa, there's a whole lot more here. Especially, at least as to the driver, who's not on the rental agreement. Well, your Honor, let me take two points in response to that. First of all, I'm not sure the record shows that whole first 15 minutes was consumed by seeking information. There is indication that he was doing things like reaching out to law enforcement, intelligence databases. But even if you look at that. Well, that was about 11.02, as I recall. But I thought the first from 10.45, 10.46 to about 11 o'clock, he's trying to get information. And there's whole segments of the, you know, where he's not doing anything other than writing. You can discern that that's what he's doing. He's on his computer and getting information. And once he gets the information on the driver's past criminal record, isn't he justified in waiting for a second trooper to come as backup? Which is what he's attempting to do at 11.02. Actually, he's not waiting for backup. If you listen to the recording, contrary to his testimony, he never states on the radio, please send backup. What happens is that about 20 minutes. At 11.02, he calls a fellow trooper. He says, Jay, are you available? Are you working right now? I've got two black males in a Chevy Tahoe, both from California, et cetera, et cetera. It's not a third-party rental, so I'm going to need to get more reasonable suspicion. Yes, sir. He was not. This is an important juncture of the stop that you're focusing on. Jay is Jay O'Donis, a K-9 officer in Chester County. Trooper Hope, first of all, does not ask Jay O'Donis to come to the scene. He doesn't ask him to come. He says, why don't you get ready? And then he testified, I wanted to let him know I'm on to something good here. I feel I'm on to something good here. It's hard to imagine expression that's closer to saying I've got a hunch here, something short of reasonable suspicion. And so as far as backup, you may be right, but let me just make sure I got the fact correct. I thought at 1058, Hope radioed the dispatcher to see if a K-9 unit was available in Chester County, and he then confirmed that the Chester County unit was out on another call. I thought at 1102 he was merely looking for backup from another officer, not necessarily a K-9-controlled officer. No, no, that's, I believe, an incorrect, Your Honor. I think when you listen to the video at 1102, the first, he addresses the person he's speaking to as Jay, J-A-Y. And looking at the transcript, you see a reference to Jay O'Donis, who is a K-9 officer. So when he's speaking to that person, 18 minutes into the stop, he's talking to the K-9 unit. It's sometime after that, it's about two minutes after that, that he doesn't call for backup. What happens is that Trooper Strenier, the trooper who's made a stop a little bit out of the road, he comes over the radio microphone, and you hear him say, hey, should I come join you? And at that point, Trooper Hope says, yeah, come back. That's the extent of Trooper Hope's calling for backup. And if you look in particular at pages 113 to 115 of the appendix, you'll see him discuss in the most detail how that sequence of events ensued. You know, if I can talk about the sequence from the outset. Again, I'm just trying to make sure. So there you've got, he's now got to figure out what's going on with this contract, because the contract, from what he can see, goes to January 7th. This is now January 15th of 2010. So he then goes up at 1110 and asks Anderson, who's the passenger, who's the one who's on the contract, if he had extended the rental. As I recall, Anderson says yes. So doesn't the officer then need to follow up if that's correct, which he and Strenier ultimately do? They ultimately do, Your Honor, but first the stop is prolonged in pursuit of the investigation. The call to Enterprise, which begins about four minutes after that encounter where the passenger and the driver both give candid answers when confronted with the agreement. So they start the call about four minutes afterwards, two minutes into the call. They've confirmed that, in fact, the agreement has been extended, just two minutes into the call. They continue that call for another five minutes to explore the passenger's rental history, to really try to coax consent out of the Enterprise representative to search the car. Yeah, I mean, one could argue that maybe Strenier went a little over. But what he's also trying to find out is, okay, how long was it extended? It turns out it was extended to the 21st. Is Anderson a person who's on the agreement? Clearly Frierson is not. Is that a violation of the agreement? There's legitimate questions that they're asking, and they're getting answers. Now, regardless whether Strenier should have asked for consent to search the vehicle. Yes, and the key question here, were the men authorized to be controlling that vehicle, was answered two minutes into the call. So I think that a view here is that Trooper Hope could have been calling Enterprise during that whole period while he's waiting to get set up with the K-9 unit. Then we wouldn't even have this issue. During the interlude that your Honor is speaking of, we've got not just the Enterprise call, we have quite a bit of conferment between the two troopers about how to proceed with the investigation. And so we have Trooper Hope saying things like, yeah, both of them have valid licenses, believe it or not. We have Trooper Hope saying, unfortunately, the passenger is on the agreement. We have Trooper Strenier saying, yeah, we've got to take that vehicle. And then we have them plotting out a plan for how they're going to separate the men and interview them to try to see if they can turn up contradictory. But Hope's in charge. He's making the calls. And at some point, again, little things keep adding up, maybe more than little things besides their criminal history. And he's trying to go to the next step. I thought what you were saying is when ultimately the decision was made to bring them out of the cars and to talk with them separately, you had when Frierson gets out of the vehicle, he is, instead of being questioned by a Trooper Hope, Hope says, I want consent to pat you down. And Frierson doesn't give it. Isn't that really the key moment for you as to whether there is enough suspicion to in effect have, call it a Terry stop or whatever you want, enough suspicion for him to have a non-consensual pat down, which ultimately happens? No, Your Honor, I don't feel that's the key moment. I feel the key moment had passed significantly earlier in this. But your point actually is that if the extension of the stop was valid, the police officers had every right to ask the individuals to get out of the car and to conduct a Terry search. I would say this, Your Honor. If there was reasonable suspicion to believe drug trafficking was afoot, and given Mr. Frierson's criminal record, there probably would have been reasonable suspicion at that point to do a frisk. To pull them out of the car and to conduct a frisk. They're allowed to pull them out of the car for no reason whatsoever under MIMS, to do a frisk on the reasonable suspicion. If they had reasonable suspicion that they were involving drug activity. Yes. Now, I would just add one caveat to that, which is that if you watch Mr. Frierson on the video, I would suggest his demeanor dispelled what would ordinarily be reasonable suspicion, because he's cooperating. He's defensive. He's carrying on this. But my point would be that it's earlier in the encounter that reasonable suspicion was lacking and it was extended. There were some visuals. Trooper Hope saw a number of cell phones in the car and recognized this vehicle as being particularly useful in the type of activity that he suspected they were involved in. Well, I think that's overstating his testimony slightly, but in an important way. What he saw was that one of the men had a second cell phone. Not a ton of cell phones. I thought there were three cell phones in the middle of the car seat. Yes, there were three in the middle, so two men, one had a second. Not a common sight for a vehicle to stop on the Pennsylvania Turnpike. Well, actually, during a cross-examination at the suppression hearing, Trooper Hope agreed that it was pretty common for people to have both a personal cell phone and a business cell phone. So right there you would have reason to have three. And I think Hope's right about that. It's not very uncommon to have two cell phones. But then you add all the things he's gotten, and the one thing I haven't even brought in is that he sees indicia of, in the past, by his experience, what could be drug activity. And this person who's three times has been convicted of significant crimes has been, was it he or was it Anderson, has been across the border to Mexico four times in the last few months. It's not in the last few months. It's four times in the previous year. The most recent visit, which comes across the radio. Hope, if you've been listening, he's here. The most recent visit was August 24, 2009, so more than five months earlier. Now, I don't think... At some point, I know your time is running, but I wanted to get your comments on the expert witness testified in this case that you contend made a statement that was really within the province of the jury. But go ahead and finish. Well, yes, we do think that the district court correctly found that statement to have violated... Are you going to put all your eggs in the stomp basket, or are you also... No, no, I don't wish to, Your Honor. I think both issues are grounds for reversal. The stomp issue probably means the case is dismissed rather than a new trial. So, of course, that would be more beneficial to my client. But I think both errors are quite grave. Can I come back to that in rebuttal, if you like? No, no, you can finish. Why don't you deal with the issue relating to the... Thank you, Your Honor. So the district court found that there was error with the expert's testimony, which was the men were working with each other in concert to distribute drugs. And what that necessarily expressed was that Mr. Frierson knew of the drugs, and he intended to aid in their distribution. Now, the government, I think, pays lip service to oppose the district court's finding there, but its primary arguments on appeal are not substantive but procedural. It says, first of all, that this was invited error, and its point there is simply that the testimony came on cross-examination. Yeah, it almost seemed like a cross. This was more of a slip than anything else. Well, regardless of... Well, I think I would say it's unfair to say that's a slip, Your Honor. This was a yes-no question. Is it true that the presence of two people in this vehicle was a factor in your opinion here? And it was clear from the pretrial proceedings that the answer to that question was yes. From the same pretrial proceedings, this expert had been admonished while he was in the courtroom not to offer an opinion getting anywhere near intent. And that's what he did the moment he got asked a question that challenged his authority.  Which is what the invited error doctrine amounts to, and it's the expert who interjected this testimony improperly. The other point the government makes is that the error was harmless. I don't think that's very persuasive because intent, of course, was the single biggest issue in this case. In fact, if you look at page 595 of the appendix, there's an interesting moment where the district court, before any evidence is even held, is telling a jury, I don't want you to worry about the fact of whether there will be legal consequences for Mr. Frierson's possession of a gun. There were going to be, and that wasn't going to be disputed in this trial. The issue here is whether he had the intents to distribute the cocaine. So, you know, properly speaking, the issue is whether there was drug trafficking. But the district court, like everyone else, was focused on what was really at issue in this trial. And the expert's testimony was the one piece of evidence that went to that and who just declared summarily that the intents existed. There was no other testimonial evidence directly linking Mr. Frierson to the drugs and no tangible evidence directly linking him to the drugs. Couldn't the counsel have pressed the witness a little bit further at that point and established that this witness was not at the scene and could not have known the information that he, the statement that he made that they were working in concert? Well, counsel could have done that, but I think this is the problem with expert testimony. He had a mantle of authority around him. Counsel didn't ask for this answer. Counsel was actually already trying to move on to his next question, and the point was really that the agent had identified two different sorts of relationships among drug dealers, robbing each other or assisting each other, and here he was choosing one of them in this case. That was basically the point counsel was trying to make. Thank you very much. We'll get you back in rebuttal. Mr. Shaw. Good afternoon, Your Honors. My name is Randy Shaw. I represent the United States of America. The district court in this case properly found that the troopers had reasonable suspicion, one, to extend the duration of the stop, and two, to frisk the defendant for weapons. Let me ask you on the second part. If Trooper Hope had reasonable suspicion to do a frisk, why did he ask for consent and repeatedly ask for consent and say that he was getting frustrated because consent wasn't given? Well, Your Honor, I would say that in this analysis under the Fourth Amendment, the subjective motive intent of the trooper is not relevant to the analysis. Whether the trooper thought he had reasonable suspicion to frisk the defendant or not is not the question. The question is whether there was a minimal objective basis for the trooper to do that. So even though the trooper was saying he was frustrated because the defendant would not consent, because from his experience as he testified, this was the first time out of hundreds of stops that the defendant had not consented to being frisked. Yeah, but you can put yourself in Trooper Hope's position there. If he had gotten the information relating to the driver of the car having three prior convictions, one of which was murder-manslaughter and also being involved with drugs and also having a weapon, I mean, you can't pick three more that really are more on point. Why would he not have been concerned about his safety at that moment instead of waiting another 35 minutes plus? Your Honor, I'm not saying that he wasn't concerned for his safety at that moment. I think as his testimony— You're trying to tell me it's an objective test, right? Yes. Okay, and why objectively wasn't he concerned then as opposed to waiting it out later on? Your Honor, objectively, I think as soon as the trooper, based on all the other factors that he saw, which he testified were consistent with his belief that the defendant was engaged in drug trafficking, as soon as he observed those factors and then saw the defendant's criminal history, I think at that point he certainly had reasonable suspicion to believe both that the defendant was engaged in drug trafficking and also that the defendant may have been armed. So his suspicion that the defendant was armed was solidified at that point, and then the additional factors that he continued to see, which included the defendant traveling into Mexico four times in the previous year, as well as the passenger renting five rental cars in the previous four months, those factors all contributed and helped even further reinforce his belief that the defendant was armed. Is there a point where we could say, you know, the stop is just getting unreasonable or a trooper pulls somebody over and they're just going to hold somebody on the turnpike until they marshal enough evidence after investigation, after investigation, phone calls, calling a car company to say this is just too much? Your Honor, I think in the abstract there may be, but in this case, as the Court has stated, the trooper had this information within about ten minutes of the stop, and this is as he was conducting investigation, which was pertinent to the traffic violation, which he's permitted to do. It almost looks like profiling because this idea of his initial pursuit of the vehicle had to do with it being a Chevy Tahoe and holding hands at a ten-inch or two position. Yes. I stopped doing that, by the way. I'm not going to put my hands there anymore. But it seemed like it was something. You now do nine to three, right? Nine to three. What's the matter with ten to two? I mean, when I learned to drive, that was the safest way to do it. And, Your Honor, I would say that based on the trooper's experience, holding your hands at ten and two, while that may be the norm for a new driver, as Your Honor said, as you learn to drive, that's certainly not the norm for the majority of people on the road based on the trooper's experience. And so when the trooper saw all these factors, it wasn't an issue of race in this case, Your Honor. The trooper had numerous factors that were very similar to the factors, as Judge Point has, as you note, that were found in Thompson to comprise reasonable suspicion. In this case – Did he wait until after Strenier got there to ask the guy if he could frisk him? I'm sorry, Your Honor? Did he wait until after Strenier got there to ask Pearson if he could frisk him? That is permissible, certainly, Your Honor. But did he wait? He did, Your Honor. Yeah, I mean, isn't that a reasonable – That's very reasonable. Based on his concerns, based on the defendant's extensive record of violent crime, as well as the recent drug trafficking felony conviction, which when you look at the timing of it, he was convicted and sentenced in November 2006. Let me get the facts on you just for a minute, and it's not necessarily the case we have before us. What if Anderson was driving? He doesn't have a record. What happens then? What would Trooper Hope do? I think if Anderson was driving in this case and he didn't have a record, I certainly think that the law says that the trooper is entitled to ask all the occupants, including the driver and passengers, out of the vehicle to frisk them if he's concerned for his safety. And in this case, whether Anderson was driving or whether the defendant Forreston was driving, the trooper was certainly – it was reasonable for him to ask the defendant as well as Anderson, or it would have been reasonable to ask them both out of the vehicle to frisk them, because of everything that he had found leading up to that point, because of his observations regarding the type of vehicle they were driving. You're telling me that he can go investigate the passenger as well? I think under the circumstances, yes, he certainly can. When he comes up, does he normally ask just the driver for the license or the passenger for the license? In this case, he asks both for the driver's licenses. Is that normal protocol? I can't speak to whether it's normal protocol or not. I don't think that it would be impermissible under the circumstances, especially in this case where Anderson was the person listed on the rental, which based on Trooper Hope, what he could see was expired at the time. When he found out pretty quickly, it would have been extended for two weeks. But that wasn't until Trooper Stranieri came to the car. So Trooper Hope in this case had to determine, one, whether the rental agreement was valid, and number two, whether he could have Anderson switch with Forreston to drive. Certainly if Anderson didn't have a license, then we'd be in a totally different situation where Forreston couldn't drive because he's not on the contract, and Anderson can't drive because he doesn't have a license. So I think that in this case, Trooper Hope was justified in taking the actions he did. Again, after all the observations he made that were consistent, Judge Fuentes, with a lot of the factors in Thompson, including the speeding, including coming from a source city and in Thompson driving along a known drug corridor, including the behavior of holding hands at 10 and 2 and not observing the Trooper and in Thompson being suspicious and not looking at the Trooper, and also the criminal history. All those factors are the same as those in Thompson, but we have more here. As Judge Amber, as you pointed out, we have the fact that it's a rental vehicle, and the Trooper testified that rental vehicles are often used by drug traffickers, and in this case it's an SUV, which the Trooper testified is the most commonly used vehicle for drug trafficking. You have the multiple cell phones, as the court has pointed out, and you also have the fact that the passenger in this case, out of the blue, volunteered that his girlfriend was a Philadelphia police officer. That just sounds like somebody being nervous. Well, Your Honor, the Trooper testified during the suppression hearing that from his experience, that's generally the driver, they would say. The driver is the person who might get the ticket, so he's the one that's going to say, okay, I've got a family member, friend, whatever the case may be, that is a police officer or that's otherwise in law enforcement. It's not common for a passenger to volunteer that information, and his training is that that is known as a disclaimer because it's made to assure the Trooper that neither Anderson, the passenger, nor defendant Fireson, the driver, were involved in any criminal activity. Can you address Agent Uptegraff's testimony? He testified at the second trial. The first trial ended up in a hung jury. He testified at both trials, Your Honor. He testified at both trials, but he didn't testify in the way that it's – the second trial on cross-examination is when this item came out that supposedly puts him in the position of allegedly stating what the intent was of Fireson. So if the first trial was a hung jury and the second trial resulted in a conviction, how can we be certain that it was highly probable that his testimony didn't contribute to the judgment of conviction? Your Honor, I would say first, if you look at the statements themselves – actually, let me back up. As the court was saying, and you had asked counsel for the appellant, whether there was any information that the expert was or was not involved in the investigation. In the record, the expert at the outset of his testimony stated that he was not involved in the investigation. He simply reviewed reports and looked at the evidence in coming to his conclusion. And that's a very important fact because obviously the jury is assumed to be intelligent enough to understand that that means that this expert does not have any special insight into the mindset, intent, motive of the defendant. He comes in as an expert and he's cloaked with this mantra of having special information and insight. He's an expert. And he explicitly told the jury that Fireson and Anderson, based on his review of the case, were working in concert. It's very powerful to come from an expert in the presence of a jury. And, Your Honor, but the expert is also – his expertise is in drug trafficking. It's not in the intent or knowledge of the defendant or the passenger. And in this case, his statement, again, was prompted. It's invited response to defense counsel's questions. Defense counsel wants to have their cake and eat it too. They want to build a question. Yeah, but what happened to Updegraft? He was an unhappy camper. He wanted to respond back. Your Honor, I think that, under the circumstances, after being asked repeatedly and attempted to, as defense counsel tried to contradict Agent Updegraft's testimony repeatedly and asked him in this case, but in this particular case, as opposed to his testimony in other situations, what was their relationship? And at that point, Agent Updegraft answered that they were working together to distribute cocaine. Now, while you look at that response, while it's a borderline response and certainly should have been more artfully stated, it doesn't touch on the issues of this case, which is whether the defendant possessed the drugs with intent to distribute or whether he possessed the file with intent to distribute. It sure does. You explicitly said that both defendants who are on trial sitting there in front of the jury were working in concert. Your Honor, but that's consistent with his direct testimony, which is that the circumstances of the case, based on his review of the reports and the evidence, not any special... He was speaking about drug defendants or suspects in general. In general, yes, Your Honor. But he was forced to answer that question by defense counsel's questions. Judge Ambrose mentioned the earlier trial. You say that your case was strong enough that you can survive the erroneous admission of evidence. It certainly was, Your Honor. But isn't the idea that there was a mistrial in this case? No, that's not correct, Your Honor. It was a hung jury. It was a hung jury. A hung jury? Yes. Isn't the fact that there was a hung jury suggest that at least one or more jurors were not satisfied? Well, Your Honor... In the strength of your case? I will say that while we don't have any record of what the jurors debated, so we can't pretend to opine into what their thought process was, why they hung. They could have hung for any number of reasons. But in this case, I would argue that the government's evidence was extremely strong. Specifically, we proved that the defendant and the passenger were both from California, which was a sort state as testified by H. Noctograph, and that they had a kilo of cocaine in the back of their vehicle. The defendant had a stolen gun on his person. There were several cell phones recovered from the Senate consul along with notes and a drug ledger. This drug ledger referenced an individual named Pork, owing $4,500 in cash. The defendant was found with a pager on his person that referenced Holler at Pork, the same individual that's mentioned in the drug ledger. Let's go back to one of Judge Fuente's questions. How long can you hold somebody? I mean, let's assume for the moment that Frierson had taken the unloaded weapon on him and just put it under the seat so when he was frisked he had no weapon on him whatsoever. What would happen next? Would they have waited for whatever, half an hour, 45 minutes, an hour for a K-9 unit to show up? I think under the circumstances that would have been appropriate, as it's up on appeal to the Supreme Court, obviously, but I think it's Rodriguez. They're deciding whether, in the absence of reasonable suspicion, it's proper to allow waiting seven, eight minutes for a K-9 to show up. I think they would have asked if they could search the car. Well, they certainly would have asked, Your Honor, and if they refused, then I think it would have been appropriate based on the totality of the circumstances, which is what our vizu demands that this Court apply. Under that totality, it would have been reasonable to wait for a K-9. While Trooper Hope, in this case, decided not to do that and decided to continue the investigation with the help of Trooper Shannary, in fact, he allowed and tried to facilitate this investigation as quickly as possible. Because he called the K-9 unit, that individual had not shown up, so Trooper Hope enlisted the help of Trooper Shannary and attempted to further investigate and either confirm or dispel his suspicions that these individuals were engaged in drug trafficking, as well as that Farson may have been armed, Your Honor. Thank you very much. Thank you. Mr. Donohue. Thank you, Your Honors. Council for the Government mentioned the recent Thompson case, and I want to use that to explain right off why there is not reasonable suspicion here. In Thompson, the driver gave an implausible answer about what his itinerary was. He didn't have enough baggage to be taking the trip he said he was going to be taking. Now that's the kind of factor that supports a particularized suspicion of criminal activity. And there's nothing like that here. Judge Amber, I read you to be expressing some skepticism about Trooper Hope's statement of the importance of the passenger's claim that his girlfriend was a police officer. It's worse than that. You know, Hope is putting so much emphasis on that point that by page 179 of the appendix, he's misstating what happens. He's claiming that the passenger blurted this out the moment he stood up there. That's not true. The passenger mentioned it after he'd handed over his license. So the other factors are the same, Judge. The other factors are similar to that. There's the ten and two, the fact that he's got both hands on the wheel as he's turning up an onramp. What does that mean? I mean, I don't know. What it means is that this trooper is going to say that any detail he. . . I mean, why would you be suspicious of someone with their hands. . . What it means is that this trooper was taking any detail he could recall and labeling it as suspicious and telling us to trust his. . . I'm not focusing on that. The first one is what we all get stopped for. He was going over ten miles over the speed limit. He was going 76 in the 65 zone. That's the initial stop. To me, the information that he then gets relating to the driver's record, the fact that the driver wasn't on the rental agreement, the fact that the type of vehicle that you had, et cetera, et cetera, that why was somebody with a California license, what were they doing in Pennsylvania, et cetera, that's the information that would perk your ears in terms of, hey, something more may be afoot here. But with each of those factors, Your Honor, they didn't agglomerate in the way that Carnes says they must into suspicious circumstances. So the driver's not on the rental agreement. But when he's asked about it, he says, you're right, I'm not. And it turns out that that's true, and it's true the agreement's been extended. So that's the opposite of Thomas Thompson. So you're an officer here, and what would a reasonable officer need in your view to have reasonable suspicion that there may be criminal activity afoot? You would need some aspect of this itinerary that was consistent with drug trafficking. We don't have that. The men have good reason to be in Philadelphia, as Your Honor has just said. One has a girlfriend in Philadelphia. One has family in Philadelphia. New Mexico trips are far earlier, and moreover, that information comes to the trooper's attention. Well, they're not far earlier. The last one was just four months before, five months before. I think you would need itinerary consistent with drug trafficking. What we have here is the circumstances in their totality are not just consistent with innocent behavior. They're usually associated with innocent behavior. It's common for people to visit the Philadelphia area from out of state. It's common for visitors to be in a rental vehicle a little bit after the morning rush hour en route to a destination. It's common to try to get out of a speeding ticket by mentioning that you're close to a police officer. This never worked for me. I did get it reduced one time. The guy and I talked football, and he reduced it from 74 to 69. I was very happy. Well done. Well done. All right. Thank you. All right. Thank you. Thank you, both counsel, for very well-presented arguments. We'll take the matter under advisement and call it.